# EXHIBIT A



July 7, 2022

Vernon E. Curry, PMP, CIPP/G
FOIA Officer
U.S. Census Bureau, Room 3J235
4600 Silver Hill Road
Washington, DC 20233-3700

> ### RE: Freedom of Information Act Request

Dear Mr. Curry:

The Election Law Clinic at Harvard Law School ("ELC") submits this request on behalf of Justin H. Phillips, Professor in the Department of Political Science at Columbia University ("Professor Phillips") to the Bureau of the Census ("Census Bureau" or "Bureau") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*

## I.     Requested Records

Professor Phillips requests the following records:

1.  All machine-readable files that describe the 2020 Census data for all fifty states after noise has been injected but before post-processing has occurred. Referred to as the "noisy" measurements stage, these may take the form of "histograms" as described in Abowd et al 2019. These file(s) are also described by Abowd as those produced by line 2 of algorithm 1 and referred to as "A," as the "noisy answer to a query," or as a "measurement."[1]

2.  All machine-readable files that describe the 2010 Census production settings demonstration data[2] for all fifty states after noise has been injected but before post-processing has occurred. Referred to as the "noisy" measurements stage, these may take the form of "histograms" as described in Abowd et al 2019. These file(s) are also described by Abowd as those produced by line 2 of algorithm 1 and referred to as "A," as the "noisy answer to a query," or as a "measurement."[3]

Please note that this request encompasses both digital and physical records.

If you determine that some portions of the requested records are exempt from disclosure, please (1) disclose any reasonably segregable portions of the requested records after deletion of materials exempt pursuant to 5 U.S.C. § 552(b); (2) provide an index of the withheld materials as required

---

[1] John Abowd et al., Census TopDown: Differentially Private Data, Incremental Schemas, and Consistency with Public Knowledge 4–6 (2019), https://systems.cs.columbia.edu/private-systems-class/papers/Abowd2019Census.pdf.

[2] The Census Bureau produced these demonstration data by applying the 2020 Census disclosure avoidance system to confidential data from the 2010 Census. *See* U.S. Census Bureau, Developing the DAS: Demonstration Data and Progress Metrics (2022), https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/process/disclosure-avoidance/2020-das-development.html.

[3] Abowd et al., *supra* note 1, at 4–6.



under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974); and (3) provide a detailed justification of the claimed exemptions as required under *Vaughn v. Rosen*. *Id.*

## II.   Background

The decennial census is the backbone of our nation's statistical infrastructure. The constitutionally mandated "actual enumeration" of each state's population, U.S. CONST. art. I, § 2 cl. 3, does far more than dictate the apportionment of congressional seats. Among its many uses, the census determines the legality of state and local redistricting plans, the distribution of public funding at all levels of government, and the results of important research projects conducted by academic researchers and government agencies. It is therefore crucial that the census not only report the total population of each state as accurately as possible, but also present a realistic picture of how population is distributed at lower levels of geography within the states.

The Census Bureau must balance this interest in accuracy against a competing interest in privacy. Under 13 U.S.C. § 9(a)(2), the Census Bureau is required to protect the privacy of individual responses to the decennial census. To maintain this privacy, the Bureau develops a "disclosure avoidance system," or "DAS," to mask identifying information within the data before releasing information to the public.[4] For the 2000 and 2010 censuses, the Bureau relied primarily on "data swapping" for disclosure avoidance. This method identified households that had a high risk of disclosure based on their uniqueness and "swapped" different records between tracts without altering the total populations of census blocks.[5] The 2010 DAS also incorporated partially synthetic data regeneration, top-coding, bottom-coding, recoding, and noise infusion for large households.[6]

In response to concerns regarding the privacy of census data, the Bureau adopted a new DAS for the 2020 census.[7] The goal of the new DAS was to reach differential privacy, a mathematical definition of privacy that refers to a viewer's inability to tell whether particular data was included in the original dataset when viewing an algorithm's output.[8] To accomplish this, the Bureau added a pre-determined amount of random noise at particular points in the processing of the dataset.

The 2020 Census made use of the TopDown Algorithm ("TDA") for disclosure avoidance. The algorithm first infuses differentially private noise into the Census Edited File, then post-processes

[4] JADE FORD & MOLLY DANAHY, UNDERSTANDING DIFFERENTIAL PRIVACY AND ITS IMPACT ON 2020 CENSUS DATA 1 (2021), https://campaignlegal.org/sites/default/files/2021-05/Issue%20Brief%20Differential%20Privacy%202021.05.04%20VF.pdf; *see also* LAURA MCKENNA, DISCLOSURE AVOIDANCE TECHNIQUES USED FOR THE 1960 THROUGH 2010 DECENNIAL CENSUSES OF POPULATION AND HOUSING PUBLIC USE MICRODATA SAMPLES, U.S. CENSUS BUREAU (April 2019), https://www2.census.gov/adrm/CED/Papers/CY19/2019-04-McKenna-Six%20Decennial%20Censuses.pdf (describing the history of disclosure avoidance systems).
[5] *See* McKenna, *supra* note 4, at 5.
[6] *Id.* at 9.
[7] Ron Jarmin, *Census Bureau Adopts Cutting Edge Privacy Protections for 2020 Census*, CENSUS BLOG (Feb. 15, 2019), https://www.census.gov/newsroom/blogs/random-samplings/2019/02/census_bureau_adopts.html.
[8] Cynthia Dwork & Aaron Roth, *The Algorithmic Foundations of Differential Privacy*, 9 FOUND. AND TRENDS IN COMP. SCI. 5–6 (2014), https://www.cis.upenn.edu/~aaroth/Papers/privacybook.pdf.



this data to meet invariants set in advance. Michael Hawes, a senior advisor at the Census Bureau, has described the functioning of the TDA as follows:

> At a high level the TDA has five steps. [1] It inputs the Census Edited File microdata and the geographic reference file geocoding. [2] Then it converts those microdata to a functionally equivalent histogram of counts. You can think of this as a fully saturated contingency table of every variable crossed with every other variable with the value of those cells being the number of people at that level of geography who have those specific characteristics, along with all structural zeros which will be impossible values according to the edit rules for the CEF having been removed.

> [3] Then the algorithm asks a number of queries and injects noise into those results. We call this the noisy measurement stage. . . .

> [4] Armed with these noisy measurements the system must then perform a set of optimization problems. These are designed to ensure consistency across tables and geographies and to ensure that the final histogram is populated with non-negative integer counts.

> [5] Finally, the algorithm transforms the resulting histogram back into privacy protected microdata that can be output into the Decennial Tabulation Systems.[9]

While the 2020 DAS might provide improved privacy protections when compared with the data swapping methods used in 2000 and 2010, some experts have voiced concerns that this DAS will amplify existing disparities within the census,[10] which persistently undercounts specific groups including the Black, Latino, and American Indian and Alaska Native populations.[11] For example, research analyzing data published by the Census Bureau to demonstrate the application of the 2020 Census DAS found a bias that over-counted the population of smaller counties while undercounting the populations of larger counties.[12] Other research suggests that the 2020 Census DAS may be biased in the direction of reducing the populations of racially and politically diverse neighborhoods and increasing the counts of more homogeneous neighborhoods.[13] These biases

---

[9] MICHAEL HAWES, WEBINAR: DIFFERENTIAL PRIVACY 201 AND THE TOPDOWN ALGORITHM (May 13, 2021), transcript available at https://www2.census.gov/about/training-workshops/2021/2021-05-13-das-transcript.pdf.

[10] See, e.g., STEVEN A. OCHOA & TERRY AO MINNIS, PRELIMINARY REPORT: IMPACT OF DIFFERENTIAL PRIVACY & THE 2020 CENSUS ON LATINOS, ASIAN AMERICANS AND REDISTRICTING 1-2, 5-6 (April 2021), https://www.maldef.org/wp-content/uploads/2021/04/FINAL-MALDEF-AAJC-Differential-Privacy-Preliminary-Report-4.5.2021-1.pdf.

[11] See Census Bureau Releases Estimates of Undercount and Overcount in the 2020 Census, U.S. CENSUS BUREAU(Mar. 10, 2022), https://www.census.gov/newsroom/press-releases/2022/2020-census-estimates-of-undercount-and-overcount.html.

[12] See Ochoa & Minnis, supra note 10, at 1–2, 5–6.

[13] See Christopher T. Kenny et al., The Use of Differential Privacy for Census Data and its Impact on Redistricting: The Case of the 2020 U.S. Census, 7 SCI. ADV. 1, 1 (2021), https://imai.fas.harvard.edu/research/files/DAS.pdf.**Error! Hyperlink reference not valid.**



can harm communities' ability to obtain their fair share of government funding[14] and to enforce their civil rights, including the right to equal political opportunity under the Voting Rights Act.[15] Bias in census data also interferes with academic research in health, public opinion, and many other fields.

Analysts outside the Census Bureau have limited information about the sources of any bias introduced by the 2020 Census DAS. However, research has raised questions about whether post-processing plays a systematic role in shrinking the published counts some types of communities while inflating others.[16] The Census Bureau's own top scientists have acknowledged evidence that post-processing "introduced an upward bias for small populations and a corresponding downward bias for large ones."[17]

To analyze the potential impact of the 2020 DAS on accurate population counts, including the effect of post-processing, Professor Phillips requests access to the noisy measurements files underlying the published 2020 Census data and the 2010 Census demonstration data product, as detailed above.

## III.   Application for Fee Waiver or Limitation of Fees

Professor Phillips asks that all fees for this request be waived or, in the alternative, limited. This request qualifies for such a waiver because the requested disclosure is in the public interest and is non-commercial in nature. In the alternative, this request qualifies for an exemption from search and review costs because Professor Phillips is affiliated with Columbia University, an educational institution, and this request is being made for a scholarly purpose.

In the event that the application for a complete fee waiver is denied and you estimate that more than $100 in fees will be charged, please contact us before proceeding with any search, review, or duplication.

### A.   *This request is non-commercial and sufficiently benefits the public interest to justify a fee waiver.*

Under FOIA, an agency is required to provide records without charge or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[18] The Census Bureau uses the following criteria when deciding whether a request merits a fee waiver:

---

[14] Andrew Reamer, *Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds*, Geo. Wash. Inst. Pub. Pol'y (Apr. 29, 2020), https://gwipp.gwu.edu/counting-dollars-2020-role-decennial-census-geographic-distribution-federal-funds.

[15] *See* Ochoa & Minnis, *supra* note 10, at 1–2, 5–6.

[16] *See* Kenny et al., *supra* note 13; Aloni Cohen et al., *Census TopDown: Investigating the Impacts of Differential Privacy on Redistricting*, 2ND Symposium on Foundations of Responsible Computing 5:22 (2021), https://drops.dagstuhl.de/opus/volltexte/2021/13873/pdf/LIPIcs-FORC-2021-5.pdf.

[17] John M. Abowd & Michael B. Hawes, Confidentiality Protection in the 2020 US Census of Population and Housing 24 (Jun. 7, 2022) (pre-print), https://arxiv.org/pdf/2206.03524.pdf.

[18] 5 U.S.C. § 552(a)(4)(A)(iii).



(1)    The subject of the requested records must concern identifiable operations or activities of the Federal Government;

(2)    the disclosable portions of the requested records must be meaningfully informative about Government operations or activities in order to be "likely to contribute" to an increased public understanding of those operations or activities;

(3)    the disclosure of the requested information must contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester;

(4)    the disclosure of the requested information is likely to contribute "significantly" to the public's understanding of Government operations or activities;

(5)    whether the requester has a commercial interest that would be furthered by the requested disclosure; and

(6)    whether any identified commercial interest of the requester is sufficiently great, in comparison with the public interest in disclosure, such that the disclosure is primarily in the commercial interest of the requester.[19]

All six factors favor Professor Phillips's application for a fee waiver in connection with this request.

***First***, this request clearly concerns "identifiable operations or activities of the Federal Government," since it involves data created by the Census Bureau in preparing data products for publication.

***Second***, the request contributes meaningfully to the public understanding of the Bureau's activities because it will provide new information about the impact of the 2020 DAS on the accuracy and fitness for use of the released 2020 Census data. As two senior Census Bureau officials—Associate Director for Research and Methodology John M. Abowd and Senior Advisor for Data Access and Privacy Michael B. Hawes—have noted, "[t]ransparency in the decision-making process regarding disclosure limitation is incredibly valuable, as it can help data users better understand any relevant limitations of the data they are using."[20]

Stakeholders from across and outside of the political spectrum are actively debating the Census Bureau's application of differential privacy. For example, the nonpartisan National Conference of

---

[19] 15 CFR § 4.11(l); *see also* U.S. CENSUS BUREAU, UNITED STATES CENSUS BUREAU FREEDOM OF INFORMATION ACT (FOIA) REFERENCE GUIDE (July 2015), https://www2.census.gov/foia/resources/foia_reference_guide.pdf.
[20] Abowd & Hawes, *supra* note 17, at 24.



State Legislatures wrote letters to the U.S. House,[21] Senate,[22] and Census Bureau[23] voicing concerns about the impact of the 2020 DAS on compliance with the "one-person, one-vote" principle and the Voting Rights Act. Similarly, the State of Alabama filed suit in early 2021, challenging the implementation of differential privacy on the grounds that differential privacy will result in data that conflicts with the State's right to receive accurate "tabulations of population" under 13 U.S.C. § 141. *Alabama v. United States Dep't of Com.*, 546 F. Supp. 3d 1057 (M.D. Ala. 2021). While the case was ultimately dismissed by a three-judge district court panel, the amicus filings reflect the broad spectrum of legal arguments for and against the use of differential privacy. In support of plaintiffs were amici from sixteen states,[24] the Senate of Pennsylvania Republican Caucus,[25] the State Government Leadership Foundation,[26] a professor of law,[27] and a historian.[28] The Electronic Privacy Information Center filed an amicus brief in support of Defendants.[29] This variety of parties suggests a profound public interest in differential privacy and the balance between privacy and accuracy.

Scholars in statistics, computer science, and research methodology are also debating the effects of differential privacy on the census and redistricting processes. Some experts have highlighted the benefits of differential privacy, including its mathematical rigor and its potential to allow analysts to incorporate confidence intervals when they use census data.[30] However, there are also scholars who suggest that the 2020 DAS will make it more challenging both to draw districts that meet

---

[21] Letter from Tim Storey, Exec. Dir., National Conference of State Legislatures., to The Honorable Carolyn Maloney, Chair, House Committee on Oversight and Reform, and The Honorable Jim Jordan, Ranking Member, House Committee on Oversight and Reform (May 14, 2020), https://www.ncsl.org/documents/statefed/House-Census-letter-5-20.pdf.

[22] Letter from Tim Storey, Exec. Dir., National Conference of State Legislatures, to The Honorable Ron Johnson, Chair, Senate Committee on Homeland Security and Governmental Affairs, and the Honorable Gary Peters, Ranking Member, Senate Committee on Homeland Security and Governmental Affairs (June 1, 2020), https://www.ncsl.org/documents/statefed/Senate-Census-Letter-FINAL0620.pdf.

[23] Letter from Tim Storey, Exec. Dir., National Conference of State Legislatures, to The Honorable Steven Dillingham, Dir., U.S. Census Bureau (May 26, 2020), https://www.ncsl.org/documents/statefed/Census-Bureau-letter-May26-FINAL.pdf.

[24] Brief for State of Utah and 15 Other States as Amici Curae Supporting Plaintiffs, Alabama v. Dept. of Commerce, 2021 WL 2668810 (M.D. Ala. 2021) (3:21-cv-00211-RAH-ECM-KCN).

[25] Brief for (1) Senate of Pennsylvania Republican Caucus, (2) Pennsylvania Senate President Pro Tempore Jake Corman, and (3) Pennsylvania Senate Majority Leader Kim Ward as Amici Curae Supporting Plaintiffs, Alabama v. Dept. of Commerce, 2021 WL 2668810 (M.D. Ala. 2021) (3:21-cv-00211-RAH-ECM-KCN).

[26] Memorandum in Support of the State Government Leadership Foundation et al., Alabama v. Dept. of Commerce, 2021 WL 2668810 (M.D. Ala. 2021) (3:21-cv-00211-RAH-ECM-KCN).

[27] Brief for Professor Jane Bambauer as Amicus Curae Supporting Plaintiff's Complaint for Declaratory and Injunctive Relief, Alabama v. Dept. of Commerce, 2021 WL 2668810 (M.D. Ala. 2021) (3:21-cv-00211-RAH-ECM-KCN).

[28] Margo Anderson's Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs, Alabama v. Dept. of Commerce, 2021 WL 2668810 (M.D. Ala. 2021) (3:21-cv-00211-RAH-ECM-KCN).

[29] Brief for Electronic Privacy Center as Amicus Curae Supporting Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction and Petition for Writ of Mandamus, Alabama v. Dept. of Commerce, 2021 WL 2668810 (M.D. Ala. 2021) (3:21-cv-00211-RAH-ECM-KCN).

[30] *See* JADE FORD AND MOLLY DANAHY, UNDERSTANDING DIFFERENTIAL PRIVACY AND ITS IMPACT ON 2020 CENSUS DATA 11 (2021); Moon Duchin, *Privacy in Census Data: Math Meets Policy* at 41:40, TUFTS SEMINAR (July 7, 2020), https://www.youtube.com/watch?v=oIRL5vBWq84.



Voting Rights Act requirements and to identify potentially malapportioned districts. For example, a study by Christopher T. Kenny et al. finds that the 2020 DAS "systematically undercounts the population in mixed-race and mixed-partisan precincts, yielding unpredictable racial and partisan biases."[31] This article suggests that the added noise makes it "impossible for states to follow the principle of One Person, One Vote, as it is currently interpreted by courts and policy-makers."[32]

In short, there is deep disagreement over whether the 2020 DAS provided a dataset that is fit for its intended purposes, including redistricting and enforcement of voting and civil rights.

Unfortunately, this debate is taking place against a backdrop of incomplete information. Abowd and Hawes recently acknowledged that "the Census Bureau's external stakeholders were justifiably disappointed and concerned about the timing, pace, and mechanisms of the agency's public engagement regarding the development of the 2020 DAS."[33] The Bureau still has not fully addressed the shortcomings in its public engagement, including its failure to publish noisy data for researchers to compare with post-processed data.

Thus, the public can make only educated guesses about whether any biases in the 2020 DAS are caused by the injection of noise, post-processing, or both. This question has profound policy implications. Without understanding how (if at all) the 2020 DAS introduces bias, stakeholders cannot identify the aspects of the DAS (if any) that need to be reformed or rethought as the Bureau prepares for the 2030 Census. Having access to the noisy measurements file will empower the public to engage more intelligently in debates over the future of privacy protection in census data. Noisy data will also provide insight into the quality of the official 2020 Census data by revealing whether post-processing caused systematic distortions.

**Third**, this disclosure will be useful and interesting to an expansive pool of stakeholders including state and local governments, academic scholars, think tanks, civil rights groups, and other non-profit organizations. Census data generate some 17,000 publications per year and are "widely used in analyses of the economy, population change, and public health," as well as being "indispensable tools for federal, state, and local planning."[34] Everyone who works directly with census data or relies on the results of such work would benefit from transparency regarding the 2020 DAS and any biases it may introduce. Releasing this information would help data users distinguish between use cases for which census data is fit and those that may be compromised by the application of differential privacy.

**Fourth**, the contribution that this request will make to public understanding will be significant.

As noted above, there is significant dispute over the effects of the 2020 DAS. Currently, the public has minimal insight into how, if at all, the 2020 DAS may have made the data less fit for use.

---

[31] Christopher T. Kenny et al., *The Use of Differential Privacy for Census Data and its Impact on Redistricting: The Case of the 2020 U.S. Census*, 7(41) SCI. ADV. 1, 1 (2021), https://imai.fas.harvard.edu/research/files/DAS.pdf
[32] *Id.* at 12.
[33] JOHN M. ABOWD & MICHAEL B. HAWES, CONFIDENTIALITY PROTECTION IN THE 2020 US CENSUS OF POPULATION AND HOUSING 24 (Jun. 7, 2022), https://arxiv.org/pdf/2206.03524.pdf.
[34] Steven Ruggles et al., *Differential Privacy and Census Data: Implications for Social and Economic Research*, 109 AM. ECON. ASS'N PAPERS & PROC. 403, 403 (2019).



Professor Phillips seeks to obtain information that will help measure the potential biases that may have been incorporated when the Bureau conducted post-processing. By revealing this information, this request may settle some of the ongoing debates over the impact of the 2020 DAS on the usefulness of 2020 Census data for redistricting, scholarship, and other use cases.

*Fifth*, Professor Phillips and ELC have no commercial interest in this FOIA request. Professor Phillips is an academic researcher who is solely interested in studying the impact of the 2020 DAS and communicating those findings to the public. ELC is a non-profit organization that provides legal services to a variety of clients. ELC is submitting this FOIA request on behalf of Professor Phillips solely to further their missions to educate and serve the public.

*Sixth*, since Professor Phillips and ELC have no commercial interest in documents related to this request, there is no need to balance that interest with the public interest: this request is not primarily in the commercial interest of the requester.

For the reasons listed above, Professor Phillips and ELC request that any fees associated with this request be waived pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and in conformity with 15 CFR § 4.11(l).

> B. *Professor Phillips is exempt from search and review fees as a member of an educational institution.*

In the event that the Bureau determines Professor Phillips is not eligible for a complete fee waiver, he requests a waiver of search and review fees based on his status as a member of an educational institution.

Pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), fees shall be limited to "reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research." Professor Phillips is a tenured professor at Columbia University who intends to use the results of this request for scholarly research.

### IV.    Application for Expedited Processing

Professor Phillips requests that the processing of this request be expedited pursuant to 15 C.F.R. § 4.6(f)(1). This request qualifies for expedited processing for two independent reasons.

*First*, the request involves "[a] matter of widespread and exceptional media interest involving questions about the Government's integrity which affect public confidence."[35]

The 2020 Census has attracted significant interest from the media and the public both because of the consequences the census has and because of the context in which the census was conducted. Census results guide some of the most significant political developments of each decade, including the redrawing of voting districts and the distribution of trillions of federal dollars through hundreds

---

[35] 15 C.F.R. § 4.6(f)(1)(iii)



of federal spending programs.[36] The 2020 Census results were published in the wake of the COVID-19 pandemic, which put the Bureau under immense stress and increased public scrutiny of the results.[37] Much of the public debate about the 2020 DAS centers on whether it amplifies inequities in the census that already exist due to unequal undercounts. Given the intense scrutiny of the census generally, it is unsurprising that the implementation of a new DAS would generate "widespread and exceptional" interest and affect public confidence in government functions that rely on census data.

***Second***, the request involves "[a]n urgency to inform the public about an actual or alleged government activity."[38]

While the collection of household responses for the next decennial census will not begin until 2030, the planning phase of the 2030 Census program is already underway. The Government Accountability Office has indicated that the Census Bureau is currently undertaking its "Design selection phase" where it selects "[m]ajor design innovations for Census 2030."[39] This portion of the cycle is scheduled through fiscal year 2024.[40] The Census Bureau's budget submission for fiscal year 2023 also highlights the ongoing design selection phase, where the architecture to carry out the 2030 Census is being planned.[41] Further, the Census Bureau indicates that during fiscal year 2023, it will begin work on data privacy, "including a focus on maintaining or improving data accuracy while using differential privacy to ensure disclosure avoidance for respondent data."[42] Given the time constraints on conducting this research in time to provide advice and analysis for the 2030 Census, this request involves clear urgency to inform the public.

―――――

In order to expedite delivery of these requested documents and in order to reduce possible fees incurred, I am requesting that these documents be delivered either digitally via email or on a data disk via the U.S. Postal Service.

---

[36] *See* Andrew Reamer, *Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds*, GEO. WASH. INST. PUB. POL'Y (Apr. 29, 2020), https://gwipp.gwu.edu/counting-dollars-2020-role-decennial-census-geographic-distribution-federal-funds; Ron Jarmin, *Redistricting Data: What to Expect and When*, CENSUS BLOG (July 28, 2021),
https://www.census.gov/newsroom/blogs/director/2021/07/redistricting-data.html.
[37] *See* Jarmin, *supra* note 36; Yurij Rudensky, *How Changes to the 2020 Census Timeline will Impact Redistricting*, BRENNAN CENTER (May 4, 2020), https://www.brennancenter.org/our-work/research-reports/how-changes-2020-census-timeline-will-impact-redistricting; Zach Montellaro, *Delayed census data kicks off flood of redistricting lawsuits*, POLITICO (May 1, 2021), https://www.politico.com/news/2021/05/01/redistricting-lawsuits-485161.
[38] 15 C.F.R. § 4.6(f)(1)(iv).
[39] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-22-104357, 2020 CENSUS: LESSONS LEARNED FROM PLANNING AND IMPLEMENTING THE 2020 CENSUS OFFER INSIGHTS TO SUPPORT 2030 PREPARATIONS 3 (2022), https://www.gao.gov/assets/gao-22-104357.pdf.
[40] *Id.*
[41] U.S. CENSUS BUREAU, U.S. CENSUS BUREAU'S BUDGET FISCAL YEAR 2023, CEN-158 (2022), https://www2.census.gov/about/budget/congressional-budget-justification-fy-2023.pdf.
[42] *Id.* at CEN-163.



**Please email copies of responsive documents to**:

> rgreenwood@law.harvard.edu

**Or please mail copies of responsive documents to:**

> Ruth Greenwood
> Election Law Clinic
> Harvard Law School
> 6 Everett Street, Suite 4105
> Cambridge, MA 02138

Should you elect, for any reason, to withhold, redact, or deny the release of any record responsive to this request, I ask that you provide me with an explanation for each withholding or redaction, along with pertinent legal citations.

Please confirm receipt of this request and provide me with an estimate of processing time.

Thank you for your time and attention.

Sincerely,

Theresa J. Lee
Election Law Clinic
Harvard Law School
6 Everett Street, Suite 4105
Cambridge, MA 02138
thlee@law.harvard.edu



## STATEMENT BY REQUESTER JUSTIN H. PHILLIPS

By signing below, I authorize the Election Law Clinic at Harvard Law School to obtain the requested records on my behalf.

By: _____

Name:    Justin H. Phillips

Date: 7/7/2022